# 21-3079-cv

## United States Court of Appeals
### *for the*
## Second Circuit

———————◆———————

EVERYTOWN FOR GUN SAFETY ACTION FUND, INC.,

*Plaintiff-Appellee,*

– v. –

DEFCAD, INC., ODYSEE USER xYEEZYSZN, DEFCAD USER xYEEZYSZN, THE GATALOG, DEFCAD USER FREEMAN1337, TWITTER USER xYEEZYSZN, PHILLIP ROYSTER,

*Defendants-Appellants,*

ODYSEE USER THEGATALOG-PRINTABLEMAGAZINES,

*Defendant,*

TWITTER, INC.,

*Intervenor.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANTS-APPELLANTS

DANIEL L. SCHMUTTER
HARTMAN & WINICKI, PC
*Attorney for Defendants-Appellants*
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, Defcad, Inc. hereby certifies that it is a wholly owned subsidiary of Defense Distributed, a Texas non-profit corporation. Defense Distributed does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED.................................................2

STATEMENT OF THE CASE...............................................................6

    A.    Background .............................................................................6

    B.    Procedural History................................................................9

SUMMARY OF THE ARGUMENT .....................................................15

STANDARD OF REVIEW ................................................................19

ARGUMENT .................................................................................20

    I.    The First Amendment Required the District Court to Apply a More Rigorous Test Before Ordering the Disclosure of the Anonymous Defendants-Appellants' Identities ..................................20

        A.    The Anonymous Defendants Have a Fundamental First Amendment Right to Engage in Anonymous Speech ..............20

        B.    This Court Must Apply the Traditional First Amendment Test to the *Ex Parte* Discovery Order.................20

        C.    Before Courts Unmask Anonymous Speakers, Plaintiffs Must Meet a Substantial Evidentiary and Procedural Burden....................................................23

    II.    The District Court Failed to Apply the First Amendment's Anonymous Speech Standard Prior to Issuing the *Ex Parte* Discovery Order .......................................................26

        A.    Defendants Have Used the Marks in Question for Expressive Purposes Protected by The First Amendment................................................................26

        B.    There Is No Trademark Exception to First Amendment Protections for Anonymous Speakers.......................................42

C.      The *Arista Records/Sony Music* Standard Concerned Copyright Claims Involving a Specific and Distinct Speech Interest ........................................................................... 45

III.      When Analyzed Under the Correct First Amendment Protective Approach, Granting Plaintiff-Appellee's *Ex Parte* Application to Order Unmasking Discovery was Erroneous and Unwarranted ...................................................................... 48

A.      No Notice was Required by the District Court or Provided by the Plaintiff-Appellee ........................................... 48

B.      Plaintiff-Appellee Did Not Meet Any Meaningful Evidentiary Standard in Its Application for Unmasking Discovery .................................................................................. 49

C.      The District Court Performed no Balancing of Defendants' First Amendment Interests, Nor Would Such Balancing Favor Unmasking ........................................... 61

IV.      The *Ex Parte* Discovery Order Employs an Utterly *Ad Hoc* Third Party Procedure Not Tethered To Fed. R. Civ. P. 45 ............... 62

CONCLUSION ....................................................................................... 63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*1O Group, Inc. v. Does 1-19*,
  2010 WL 11583153 (N.D. Cal. Sept. 23, 2010) ....................................................46

*Allied Interstate LLC v. Kimmel & Silverman P.C.*,
  No. 12 CIV. 4204 LTS SN, 2013 WL 4245987 (S.D.N.Y. Aug. 12, 2013).........60

*AM Gen. LLC v. Activision Blizzard, Inc.,*
  450 F. Supp. 3d 467 (S.D.N.Y. 2020)....................................................................57

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010)......................................................................... *passim*

*Art of Living v. Does 1-10*,
  2011 WL 5444622 (N.D. Cal. Nov. 9, 2011) ...............................20-21, 22, 24, 25

*Art of Living v. Does*,
  2011 WL 3501830 (N.D. Cal. Aug. 10, 2011) .....................................................20

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984)...............................................................................................19

*Brown v. Elec. Arts, Inc.*,
  724 F.3d 1235 (9th Cir. 2013)...............................................................................44

*Brown v. Socialist Workers '74 Campaign Committee (Ohio)*,
  459 U.S. 87 (1982).................................................................................................21

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
  425 F.3d 211 (3d Cir. 2005)..................................................................................45

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc*.,
  886 F.2d 490 (2d Cir. 1989).................................................................. 41, 44, 57

*CPC Int'l v. Skippy, Inc.*,
  214 F.3d 456 (4th Cir. 2000)................................................................................43

*Deere & Co. v. MTD Prod., Inc.*,
  41 F.3d 39 (2d Cir. 1994)......................................................................................32

*Def. Distributed v. U.S. Dep't of State*,
   121 F. Supp. 3d 680 (W.D. Tex. 2015), *aff'd sub nom., Def. Distributed
   v. United States Dep't of State,* 838 F.3d 451, 2016 WL 5383110
   (5th Cir. 2016) ..................................................................................30

*Dendrite Int'l v. Doe No. 3*,
   775 A.2d 756 (N.J. App. Div. 2001) ........................................... *passim*

*Doe v. 2TheMart.com Inc.*,
   140 F. Supp. 2d 1088 (W.D. Wash. 2001) ..........................................20

*Doe v. Harris*,
   772 F.3d 563 (9th Cir. 2014) ..............................................................21

*Empresa Cubana del Tabaco v. Culbro Corp.*,
   399 F.3d 462 (2d Cir. 2005) ...............................................................58

*Faconnable USA Corp. v. John Does 1-10*,
   2011 WL 2015515 (D. Colo. May 24, 2011), *vacated as moot*,
   799 F. Supp. 2d 1202 (D. Colo. 2011) ................................................42

*First Nat. Bank of Cincinnati v. Pepper*,
   547 F.2d 708 (2d. Cir. 1976) ..............................................................19

*Goldberg v. Cablevision Systems Corp.*,
   261 F.3d 318 (2d Cir. 2001) ..................................................................2

*Highfields Capital Mgm't, L.P. v. Doe*,
   385 F. Supp. 2d 969 (N.D. Cal. 2005) ....................................... *passim*

*In re Anonymous Speakers*,
   661 F.3d 1168 (9th Cir. 2011) ............................................................25

*Independent Newspapers, Inc. v. Brodie*,
   966 A.2d 432 (Md. Ct. App. 2009) ....................................................24

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*,
   823 F.3d 153 (2d Cir. 2016) ...............................................................33

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*,
   828 F.2d 1482 (10th Cir. 1987) ..........................................................56

*Katz v. Modiri*,
   283 F. Supp. 2d 883 (S.D.N.Y. 2003) ................................................57

*Klein v. Long*,
   275 F.3d 544 (6th Cir. 2001) ................................................................2

v

*Koch Indus. v. Does,*
  2011 WL 1775765 (D. Utah May 9, 2011).................................................... 42, 43

*L.L. Bean, Inc. v. Drake Publishers, Inc.,*
  881 F.2d 26 (1st Cir. 1987) ............................................... 36, 44, 58, 59

*Lamparello v. Falwell,*
  420 F.3d 309 (4th Cir. 2005)................................................... 32, 40, 52

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,*
  464 F. Supp. 2d 495 (E.D. Va. 2006) ........................................... 38, 51

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,*
  507 F.3d 252 (4th Cir. 2007)..................................................... 40, 41

*Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.,*
  868 F. Supp. 2d 172 (S.D.N.Y. 2012).................................... 29, 32, 58

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.,*
  156 F. Supp. 3d 434 (S.D.N.Y. 2016).......................................... *passim*

*Malibu Media, LLC*
  *v. John Doe Subscriber Assigned IP Address 174.51.234.104,*
  2013 WL 3753436 (D. Colo. July 14, 2013) ........................................46

*Mattel, Inc. v. Walking Mountain Prods.,*
  353 F.3d 792 (9th Cir. 2003)......................................................... 40, 52

*McIntyre v. Ohio Elections Com'n,*
  514 U.S. 334 (1995) ............................................................21

*Mobilisa, Inc. v. Doe,*
  170 P.3d 712 (Ariz. App. 2007)........................................................24

*Mullane v. Central Hanover Bank & Trust Company,*
  70 S. Ct. 652 (1950) ..............................................................48

*New Kids on the Block v. News America Pub., Inc.,*
  971 F.2d 302 (9th Cir. 1992)...........................................................45

*Nike, Inc. v. Just Did It Enter.,*
  6 F.3d 1225 (7th Cir. 1993)............................................................43

*Nikon, Inc. v. Ikon Corp.,*
  803 F. Supp. 910 (S.D.N.Y. 1992).......................................................55

*Polaroid Corp. v. Polarad Electronics Corp.*,
   287 F.2d 492 (2d Cir. 1961).....................................................................50

*Protectmarriage.com v. Courage Campaign*,
   680 F. Supp. 2d 1225 (E.D. Cal. 2010)..................................................29

*Radiance Found., Inc. v. N.A.A.C.P.*,
   786 F.3d 316 (4th Cir. 2015)...................................................................29

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989)............................................................ *passim*

*Ron Paul 2012 Presidential Campaign Committee v. John Does 1-10*,
   Case No. 3:12-cv-00240-MEJ (Mar. 8, 2012) ......................................42

*Salehoo Grp v. ABC*,
   722 F. Supp. 2d 1210 (W.D. Wa. 2010) ...............................................42

*Signature Management Team LLC v. Doe*,
   876 F.3d 831 (6th Cir. 2017)...................................................................62

*Sony Music Entertainment, Inc. v. Does 1-40*,
   326 F. Supp. 2d 556 (S.D.N.Y. 2004).............................................. *passim*

*Strike 3 Holdings, LLC v. Doe*,
   2019 WL 4752094 (E.D.N.Y. Sept. 30, 2019) ......................................48

*Tiffany (NJ) Inc. v. eBay, Inc.*,
   576 F. Supp. 2d 463 (S.D.N.Y. 2008)....................................................60

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*,
   221 F. Supp. 2d 410 (S.D.N.Y. 2002).............................................. *passim*

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993)............................................................ 56-57

*UMG Recordings, Inc. v. Does 1-4*,
   2006 WL 1343597 (N.D. Cal. Mar. 6, 2006).........................................46

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001)....................................................................30

*VIP Prod. LLC v. Jack Daniel's Properties, Inc.*,
   953 F.3d 1170 (9th Cir. 2020)............................................................ 30, 44

*WIZKIDS/NECA, LLC v. TIII Ventures, LLC*,
   No. 17-CV-2400 (RA), 2019 WL 1454666 (S.D.N.Y. Mar. 31, 2019)...............58

*Woodstock Ventures LC v. Woodstock Roots*, LLC,
387 F. Supp. 3d 306 (2019)......................................................................53

*Yankee Pub. Inc. v. News America Pub. Inc.*,
809 F. Supp. 267 (S.D.N.Y. 1992).............................................. *passim*

## Statutes & Other Authorities:

U.S. Const., Amend. I ................................................................ *passim*

U.S. Const., Amend. XIV ........................................................... *passim*

15 U.S.C. § 1114 ......................................................................................1

15 U.S.C. § 1125(a) .................................................................................1

15 U.S.C. § 1125(c)(3)(A)(ii) ................................................................60

18 U.S.C. §§ 2701-2713 ........................................................................13

28 U.S.C. § 1294 ......................................................................................2

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1338 ......................................................................................1

Fed. R. Civ. P. 45 ...................................................................... *passim*

Harriette K. Dorsen, *Satiric Appropriation and the Law of Libel, Trademark and Copyright: Remedies Without Wrongs,* 65 B.U.L. Rev. 923 (1986) ...................44

Mark Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 YALE L.J. 1687 (1999) ........................................................................43

McCarthy on Trademarks and Unfair Competition § 31:153 (4th ed. 2001)... 37, 51

NYGBL § 360-L ................................................................... 58, 60

# JURISDICTIONAL STATEMENT

This case was filed in the U.S. District Court, Southern District of New York on October 22, 2021 naming, *inter alia*, several individual defendants who had been engaged in First Amendment protected anonymous on-line speech. A13.[1,2] The court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1338, as the Complaint asserts claims under 15 U.S.C. § 1114 and 1125(a).

On November 5, 2021, the district court entered an *ex parte* order directing the disclosure of identifying information about the anonymous defendants to unmask them in violation of the First and Fourteenth Amendments to the United States Constitution and the Federal Rules of Civil Procedure ("Ex Parte Discovery Order"). SPA1. Several of the anonymous defendants immediately filed an emergency letter motion to vacate the Ex Parte Discovery Order ("Emergency Letter Motion").

On December 17, 2021, the district court entered an order approving of a stipulation between Plaintiff-Appellee and Intervenor Twitter, Inc. ("Twitter") directing the disclosure of the unmasking information, which order effectively denied the anonymous defendants' Emergency Letter Motion ("Twitter Order"). SPA6.

---

[1] Citations to the Joint Appendix are designated "A__," Citations to the Special Appendix are designated "SPA__."

[2] Portions of this brief are based, with permission, on the Amicus Curiae brief filed by the Electronic Frontier Foundation in Docket No. 21-2806.

Defendants-Appellants filed a timely notice of interlocutory appeal on December 21, 2021. A475.

This Court has appellate jurisdiction pursuant to the collateral order doctrine and 28 U.S.C. § 1294. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010). Both orders appealed from are discovery orders directed at third parties such as Twitter, Odysee, Inc., and "any third party service provider providing services to Defendants," none of whom could reasonably be expected to incur a contempt order in someone else's lawsuit in order to preserve a right of appeal. SPA3.

Further, even though the Emergency Letter Motion on behalf of the anonymous defendants was never formally denied by the district court, entry of the Twitter Order was directly inconsistent with the relief sought in that motion, and therefore the anonymous defendants' Emergency Letter Motion was "necessarily denied" for the purposes of appellate jurisdiction. *See Goldberg v. Cablevision Systems Corp.*, 261 F.3d 318, 323-24 (2d Cir. 2001); *Klein v. Long*, 275 F.3d 544, 549–50 (6th Cir. 2001).

## STATEMENT OF ISSUES PRESENTED

This is a case of first impression. Appellants appeal an *ex parte* discovery order entered by the district court without notice to *anyone* (the "Ex Parte Discovery Order") and an Order Approving Stipulation Between Plaintiff Everytown for Gun Safety Action Fund, Inc. and Third-Party Twitter, Inc., which orders non-party

2

Twitter to produce such information by December 24, 2021 ("Twitter Order").[3] The Ex Parte Discovery Order and the Twitter Order threaten to unmask the identity of internet users engaged in anonymous speech protected by the First Amendment to the United States Constitution. The unprecedented and unauthorized *ex parte* procedure used by Plaintiff-Appellee fundamentally violates the requirements of the Fourteenth Amendment due process clause. Plaintiff-Appellee's *ex parte* attempts at unmasking are calculated to result in harassment and intimidation of the individuals whose identities they are trying to uncover and chill constitutionally protected speech.

It is essential that courts conscientiously protect online speakers' First Amendment right to anonymity before issuing unmasking orders. The loss of anonymity irreparably harms online speakers and discourages others from speaking at all. The district court was required to pause and meaningfully consider the First Amendment implications of the discovery sought by Plaintiff-Appellee, applying the correct test designed to balance the needs of plaintiffs and the rights of defendants

---

[3] On December 22, 2021, this Court issued an emergency administrative stay. (21-3079 ECF No. 22.)

Citations in the form "ECF No. __" refer to the district court docket. Citations in the form "21-3079 ECF No. __" refer to the Second Circuit docket in this appeal. Citations in the form "21-2806 ECF No. __" refer to the Second Circuit docket in the previous writ of mandamus proceeding with docket number 21-2806.

in Doe cases such as this one. The district court failed to do so, and chose instead to adopt a lower standard that has no place in a trademark case, much less in a case where, as here, Defendants-Appellants are using a trademark for an expressive purpose.

The district court applied the wrong standard, relying on *Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) and *Sony Music Entertainment, Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 564 (S.D.N.Y. 2004), which are applicable *only* to music downloading (copyright), having nothing whatever to do with First Amendment anonymity claims in a trademark litigation, especially where those anonymous parties have actually specially appeared and are actively litigating, as these Defendants-Appellants have. This Circuit has not previously ruled on the correct standard to apply in protecting the First Amendment interests of anonymous speakers. *Arista Records* and *Sony Music* are not about speech or expression but about the simple theft of intellectual property. This Court has yet to establish a rule for the rigorous protection of the First Amendment interests of anonymous speakers. The district court erroneously believed that the procedures set forth in *Arista Records* and *Sony Music* apply to such protected speech and in doing so failed to provide any meaningful protection for Defendants-Appellants' First Amendment rights.

Notably, in obtaining the Ex Parte Discovery Order, Plaintiff-Appellee failed to provide any Defendant-Appellant notice of its application to the court,

4

notwithstanding that in its Complaint Plaintiff alleges that it has a street address for Defendant Defcad, Inc. ("Defcad"), email addresses for at *some* of the anonymous parties, and Twitter addresses for others. A17–19. Yet, nowhere does Plaintiff allege that it tried to provide even *informal* notice using these methods.

Further, the Ex Parte Discovery Order purports to provide for third party discovery without resort to the Fed. R. Civ. P. 45 subpoena process and its procedures and protections. In fact, it purports to bind not just specific non-parties that are not before the court, but also a generic category of "third party service providers" without specification. SPA3. The Ex Parte Discovery Order is fundamentally lawless, and coercive, as it orders third parties, in some instances an unlimited number of unidentified third parties, to provide information unmasking the anonymous defendants with no means for such parties to protect their anonymity.

Having been deprived of notice and deprived of an opportunity to oppose the Ex Parte Discovery Order up front, Defendants-Appellants scrambled to retain counsel and filed an Emergency Letter Motion below seeking to stay the Ex Parte Discovery Order to allow time to fully brief the issue and seeking to vacate the order, but the district court denied relief only as to Defendant-Appellant Defcad and *ignored* the motion as to the other Defendants-Appellants. A209-23. The anonymous defendants asked the district court to rule on their urgent motion, but the court ignored their requests. A245. It was only on December 17, 2021, when the court

ordered non-party Twitter to produce the unmasking information that anonymous defendants' motion could be deemed denied. SPA6.

The district court persists in its insistence that the anonymous defendants' identities be revealed despite the fact that they have retained counsel, have specially appeared, are already before the court, and have agreed to be bound by orders of the court -- thereby obviating any need to unmask them for the purpose of service of process, entry of a preliminary injunction, or any other aspect of the lawsuit. In such a context the threat of unmasking is purely and solely coercive.

Without a reversal of the district court's unprecedented and unauthorized orders, the anonymous defendants will be unmasked and will have their First Amendment rights irreparably ripped from them.

## STATEMENT OF THE CASE

### A.    Background

On October 22, 2021, Plaintiff-Appellee Everytown For Gun Safety Action Fund, Inc. ("Plaintiff-Appellee" or "Everytown") filed a Complaint alleging federal and State trademark infringement type claims. A13.

In connection with its Complaint, Plaintiff-Appellee sought and obtained an *ex parte* order to show cause setting forth briefing, a hearing for a preliminary injunction, and expedited discovery. SPA1.

6

The Complaint names as defendants several anonymous online user accounts that it describes as follows: Odysee User xYeezySZN; Defcad User xYeezySZN; The Gatalog; Defcad User Freeman1337; Twitter User xYeezySZN, and Odysee User TheGatalog-PrintableMagazines. Plaintiff-Appellee alleges that these defendants are among the infringers of their trademarks. A13.

The crux of the dispute arises from activities that plainly constitute First Amendment protected speech. Plaintiff-Appellee alleges that "Everytown is the largest gun violence prevention organization in the United States." A20. In describing its mission, Plaintiff-Appellee portrays itself as the *number one* gun control advocacy group in the nation, holding rallies around the country, selling t-shirts and placards, lobbying for and promoting gun control laws, and generally leading the way to restrict and ban various firearms and firearms related parts and accessories. A20-24, A27-32.

Importantly, among the missions Plaintiff-Appellee most heavily emphasizes is seeking to ban what it hyperbolically refers to as: "assault weapons," "high capacity magazines," and "ghost guns." A50 ¶ 174, A279, A299-361. Notwithstanding the scary and misleading names Plaintiff-Appellee assigns to these objects, Plaintiff-Appellee cannot allege that they are anything other than lawful to possess in most parts of the United States. And it is the broad legality of these items that it strongly dislikes is what appears to frustrate Plaintiff-Appellee the most.

7

The trademark allegations are as follows. Plaintiff-Appellee alleges that certain anonymous individuals and internet platforms have created and/or made available on-line 3D printable computer files that, when printed, produce objects that display Plaintiff-Appellee's trademarks. But here is the twist essential to the defenses in this lawsuit, especially the First Amendment defenses. The objects alleged to display the Everytown trademarks when 3D printed are the very things Plaintiff-Appellee *most* opposes. The Complaint alleges that the subject computer files will 3D print as: "assault weapons," "high capacity magazines," and "ghost guns" that display Plaintiff-Appellee's trademarks. A33-47 at ¶¶ 108-156.

In fact, the Complaint cites to numerous on-line photographs and tweets that mock, goad, prod, and vilify Plaintiff-Appellee using the very objects Plaintiff-Appellee so despises and rails against publicly and politically. *Id*. Thus, the alleged use of Plaintiff-Appellees trademarks cannot be for the purpose of causing confusion, and it beggars belief that anyone would see the 3D printed parts and be confused into believing that they originated from Plaintiff-Appellee. Rather, the purpose is plainly to criticize, parody, and disparage Plaintiff-Appellee for its political activity.

This is borne out in the Complaint. Plaintiff-Appellee cannot and does not allege a single instance of actual confusion.

8

**B.    Procedural History**

With no attempt to provide any defendant notice of the application, on November 5, 2021, the court entered an order to show cause setting forth a preliminary injunction hearing date of December 2, 2021. SPA1.

The Order to Show Cause also granted Plaintiff-Appellee's application for substituted service by email and overnight courier using the electronic and physical addresses provided to the court *by Plaintiff-Appellee* in its application. *Id*. at 4. Oddly, if Plaintiff-Appellee was already aware of various means to serve at least some of the defendants, why could Plaintiff-Appellee not have used those same physical and electronic addresses to provide *informal* notice of the application to at least some of the defendants in advance?  Plaintiff-Appellee made no attempt to provide *any* kind of informal advance notice, and the district court did not require it or even suggest it. Yet the record is clear that the district court was aware of these physical and electronic addresses because the court was specifically asked to approve their use as a means of formal service. *Id*.

Most relevant to this appeal is pages 3 and 4 of the Order to Show Cause, the district court's Ex Parte Discovery Order which orders Defendant Defcad, third parties Twitter and Odysee, Inc., and "any third party service provider providing services to Defendants" to produce broad identifying information about the

9

anonymous defendants including names, addresses, banks, and financial accounts. *Id*. at 3-4.

The Ex Parte Discovery Order primarily seeks identifying information calculated to unmask the anonymous defendants.

The Ex Parte Discovery Order also binds third parties over which the district court has no jurisdiction. While one section of the order is directed at defendant Defcad, the remainder is directed at specified non-parties Twitter and Odysee, and then one section is directed at *unspecified* non-parties referred to simply as "any third party service provider providing services to Defendants." SPA3. That could be anyone, and yet the court purports to exercise jurisdiction over such a potentially limitless category.

Notably, the Ex Parte Discovery Order seeks to compel third party discovery and yet does not invoke the Fed. R. Civ. P. 45 subpoena process, which is the sole means under the Federal Rules of Civil Procedure for obtaining discovery from non-parties.

Unlike Rule 45, the Ex Parte Discovery Order includes no procedural protections for the target or the subject of the order.

Also unlike Rule 45, the Ex Parte Discovery Order requires no notice to the defendants as to whom has been served with the order and when. Accordingly, none

10

of the defendants had any notice or means to object to any of the unmasking third party discovery.

Similarly, as it relates to Defcad, the Ex Parte Discovery Order provides no means for interposing any objection to the compelled unmasking discovery.

Also on Friday November 5, 2021, the day the Order to Show cause was entered by the district court and served on Defcad, Defcad retained its current lawyers. Facing a short seven day deadline to, itself, produce the unmasking discovery, but also realizing that unknown third parties could be served without notice to anyone and would be obligated to produce unmasking discovery also within the seven day timeframe without notice to anyone, Defcad filed an Emergency Letter Motion to Stay the Ex Parte Discovery Order in order to allow Defcad and the other defendants to submit full briefing as the propriety of the order. A209. The Emergency Letter Motion noted that other defendants were in the process of retaining the same law firm (the "Hartman Firm"). The Emergency Letter Motion sought relief not just for Defcad but also for the as yet unrepresented defendants under a theory of *jus tertii*. *Id*.

On Monday November 8, 2021, Defcad filed a Supplemental Letter in further support, and the Hartman Firm filed an Appearance of Counsel with a reservation of rights as to jurisdiction and venue and indicating the Hartman firm now represented *six* of the defendants. A212.

11

Also on November 8, 2021, Daniel Schmutter of the Hartman Firm telephoned both of Plaintiff-Appellee's lawyers at the Venable firm, left them voicemail messages, and emailed them in an effort to meet and confer as to the Ex Parte Discovery Order. Neither of Plaintiff-Appellee's lawyers responded. ECF No. 37 at 2.

On November 9, 2021, the Hartman Firm filed a Supplemental Appearance indicating that the Hartman Firm now represented a seventh defendant. ECF No. 36. That same day, Defendants-Appellants filed a Brief in Further Support of the Emergency Letter Motion to Stay the Ex Parte Discovery Order. A213. As of that filing, seven of the eight defendants, including five anonymous defendants, were moving the court on an emergency basis to stay the Ex Parte Discovery Order to allow an opportunity for full briefing and to vacate the order to protect their First Amendment rights to anonymous speech. The brief also requested a stay pending appeal.

Later that day, on November 9, 2021, the district court denied the Emergency Letter Motion as to Defcad but did not rule or even mention the individual anonymous movants. A220. The court's order disregarded that there were *seven* represented defendants moving for relief, including *five* anonymous movants, not merely Defcad. *Id*.

12

On November 10, 2021, Defendants filed an emergency Petition for a Writ of Mandamus with this Court along with a motion for a stay pending the petition under docket 21-2806. This Court granted an administrative stay, and then on November 23, 2021 denied the Petition for failure to meet the very high burden for an extraordinary writ. 21-2806 ECF No. 44.

On November 25, 2021, non-party Twitter filed a motion to intervene (ECF No. 43) and a motion to modify the Ex Parte Discovery Order as to it. A226. Twitter asserted many of the same arguments asserted by Defendants-Appellants plus an argument under the federal Stored Communications Act, 18 U.S.C. §§ 2701-2713 ("SCA").

On November 29, 2021, Defendants-Appellants wrote to the district court reminding it that the Emergency Letter Motion filed by the anonymous defendants was pending. A245. The court ignored the letter.

On December 3, 2021, Defendants-Appellants filed their opposition to Plaintiff-Appellee's application for a preliminary injunction which showed: (1) that the court lacks personal jurisdiction and that venue is improper and (2) that Plaintiff-Appellee cannot demonstrate a likelihood of success on the merits of its trademark claims. ECF No. 56, A275-361.

On December 15, 2021, Plaintiff-Appellee and Twitter filed a stipulation, agreeing that Twitter would produce names, telephone numbers, email addresses,

13

and dates of birth for the anonymous defendants and sought an order approving the stipulation ("Twitter Stip"). A462-63.

That same evening, Defendants-Appellants filed their Objection to Proposed Order Approving Stipulation Between Plaintiff Everytown for Gun Safety Action Fund, Inc. and Third-Party Twitter, Inc. ("Objection"). The Objection, again, noted the continuing pendency of the undecided Emergency Letter Motion of the anonymous defendants and asserted that the court could not consider the Twitter Stip. without first deciding the pending Emergency Letter Motion, as the Twitter Stip. was inconsistent with the relief sought in the Emergency Letter Motion. The Objection also asserted that, in deciding whether to order the unmasking discovery, the court was required to consider anew the strength and merits of Plaintiff-Appellee's trademark claims in light of the very substantial opposition presented by Defendants in their December 3, 2021 papers. The Objection also asserted that the *Arista Records/Sony Music* standard proposed by Plaintiff-Appellee and Twitter and previously relied up on by the district court was the incorrect standard for a case such as this. A469.

On December 17, 2021, the court entered its Order Approving Stipulation Between Plaintiff Everytown for Gun Safety Action Fund, Inc. and Third-Party Twitter, Inc. ("Twitter Order"). SPA6.

14

The Twitter Order again ignored the pending Emergency Letter Motion of the anonymous defendants, ignored the Objection, ignored the substantial opposition filed by Defendants-Appellants on the merits of the trademark claims, and simply entered the form of order requested by Plaintiff-Appellee and Twitter. The court did not bother to make its own findings of fact. The court rubberstamped the old, outdated stipulated findings proposed by Plaintiff-Appellee and Twitter (from November 5 and November 9), even though the record had materially changed. The court, without explanation, ignored everything that is of record after November 9, 2021. *Id*. at 6-7.

On December 18, 2021 Defendants-Appellants sought from the district court a stay pending appeal, which was not granted. ECF No. 73.

On December 21, Defendants filed a Notice of Appeal as to: (1) the Ex Parte Discovery Order and (2) the Twitter Order which also had the effect of denying the Emergency Letter Motion of the anonymous defendants. A475.

On December 22, 2021, this Court issued an Emergency Administrative Stay. ECF No. 75.

## SUMMARY OF THE ARGUMENT

The right to engage in anonymous speech is among the fundamental rights embodied in the First Amendment. Anonymity enables a person to express unpopular views without fear of harassment and, perhaps, violence. The anonymous

defendants herein have chosen anonymity because they have already have been subject to such threats in the past as a result of some of the ideas they have publicly expressed.

Accordingly, when faced with a request to compel identifying, unmasking information about an anonymous speaker, courts must employ a highly rigorous, First Amendment protective approach. Federal and State courts have uniformly recognized this need, but the district court below did not do so.

First, prior to making a decision whether to unmask an anonymous speaker, courts *always* require that the anonymous speakers be given notice of the application so they may attempt to defend their First Amendment right of anonymity. The district court did not require, and the Plaintiff-Appellee did not provide, any notice to Defendants-Appellants of the application to unmask – even though the Complaint *acknowledges* that Plaintiff-Appellee had sufficient information to provide at least informal notice. This lack of notice also violated Defendants-Appellants' Fourteenth Amendment due process rights.

Second, courts require that plaintiffs meet a substantial evidentiary burden with respect to the strength of their claims. The most protective standard employed by courts in this context is the summary judgment standard, and that is the one this Court should adopt, but even those courts that choose a lesser standard require that plaintiffs satisfy a significant and meaningful standard of proof to show the strength

of their case. Here, the district court only required the barest of showings – that the Plaintiff-Appellee merely show that they have pleaded a *prima facie* case – and without the ability of the Defendants-Appellants to make any record in opposition.

Third, *only if the first two thresholds are met*, courts then balance the competing interest at stake – that is, the strength of the plaintiffs' case and their specific need for the identifying information against the potential harm to the anonymous parties, including the loss of the First Amendment right and the chilling of speech by other parties.

The district court did not follow this approach. Instead it mistakenly followed the approach from *Arista Records* and *Sony Music* -- cases wholly unsuited to protecting First Amendment rights in cases involving important expressive conduct, such as this one. This trademark case involves strong claims of parody and satire – conduct that lives at the very heart of the First Amendment. Plaintiff-Appellee and Defendants-Appellants are on the extreme opposite sides of one of the most polarized and high profile political debates in this country. *Arista Records* and *Sony Music*, on the other hand, merely involved the naked theft-by-downloading of copyrighted music, with little or no First Amendment conduct at stake.

Inherent in trademark law is the recognition of the First Amendment values embodied in expressive conduct like parody and satire. As such, the law gives a wide berth to such conduct in order to avoid suppression of free expression. This is

reflected both as a straight First Amendment defense to a claim of infringement, as well as a challenge to "likelihood of confusion" – a key element to an infringement claim. Plaintiff-Appellee's claims cannot survive the parody/satire defense, yet the district court considered none of that, nor did the *Arista Records/Sony Music* framework provide a means for the district court to do so.

Because the district court mistakenly applied the *Arista Records/Sony Music* approach, Defendants-Appellants received no notice, and Plaintiff-Appellee was required to provide only the most perfunctory of showings as to the strength of its claims. Worse, because the district court proceeded *ex parte*, it did not and could not perform any balancing of Plaintiff-Appellee's interests against Defendants-Appellants First Amendment interests or other harms and risks they will face.

Since *Arista Records* and *Sony Music* are inappropriate for cases like this that involve genuine First Amendment concerns, this Circuit urgently needs a proper framework to apply such cases, and the framework described in Section I.C. below, which every other court to address such issues has adopted in one form or another, should be the framework in this Circuit.

Finally, the third party discovery procedure employed by the district court violated the Federal Rules of Civil Procedure in that it was wholly untethered from the subpoena rule, Fed. R. Civ. P. 45, which carries with it many protections -- none of which were present in the procedure employed below.

18

## STANDARD OF REVIEW

The district court erred by failing to apply the proper legal standard in ordering the production of unmasking discovery, thereby depriving the Defendants-Appellants of their First Amendment rights.

The district court further failed to require notice to the Defendants-Appellants before jeopardizing their First Amendment rights in violation of their due process rights under the Fourteenth Amendment.

The district court disregarded the requirements of the Federal Rules of Civil Procedure in ordering discovery from non-parties without resort to Fed. R. Civ. P. 45 and all of its protections.

Because these are errors of law, the standard of review in this case is *de novo. See First Nat. Bank of Cincinnati v. Pepper*, 547 F.2d 708 (2d. Cir. 1976).

Additionally, as the record below is entirely a paper record, the findings of fact made by the district court in its mistaken application of *Arista Records* and *Sony Music* are entitled to less deference under the clearly erroneous standard of Rule 52(a) than findings based on live witness credibility. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984).

## ARGUMENT

**I.**  **The First Amendment Required the District Court to Apply a More Rigorous Test Before Ordering the Disclosure of the Anonymous Defendants-Appellants' Identities.**

### A. The Anonymous Defendants Have a Fundamental First Amendment Right to Engage in Anonymous Speech.

The First Amendment right to speak anonymously is deeply embedded in our political and expressive history. Our founders knew that protecting anonymous speech was essential to enabling critical commentary and to fostering public debate.

Today, anonymous speech has become an essential feature of our online discourse. "Internet anonymity facilitates the rich, diverse, and far-ranging exchange of ideas. The ability to speak one's mind on the Internet without the burden of the other party knowing all the facts about one's identity can foster open communication and robust debate." *Doe v. 2TheMart.com Inc.,* 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001). "Indeed, courts have recognized that the Internet, which is a particularly effective forum for the dissemination of anonymous speech, is a valuable forum for robust exchange and debate." *Art of Living v. Does*, 2011 WL 3501830 *2 (N.D. Cal. Aug. 10, 2011) (*Art of Living I*).

### B. This Court Must Apply the Traditional First Amendment Test to the Ex Parte Discovery Order.

Unmasking anonymous speakers without carefully considering their First Amendment rights can cause irreparable harm. *Art of Living v. Does 1-10*, 2011 WL

20

5444622 *9 (N.D. Cal. Nov. 9, 2011) (*Art of Living II*) (*citing McIntyre v Ohio Elections Com'n,* 514 U.S. 334, 342 (1995)). Litigants who do not like the content of internet speech by anonymous speakers often misuse "discovery procedures to ascertain the identities of unknown defendants in order to harass, intimidate or silence critics in the public forum opportunities presented by the Internet." *Dendrite Int'l v. Doe No. 3*, 775 A.2d 756, 771 (N.J. App. Div. 2001). Unmasking a speaker can lead to serious personal consequences—for the speaker or even the speaker's family—including retaliation, harassment, physical violence, and loss of a job. The risk is especially acute for speakers who would be subject to political or other persecution were their identities known. In the analogous context of identifying individuals' anonymous political activities, the Supreme Court has recognized how unmasked individuals can be "vulnerable to threats, harassment, and reprisals." *Brown v. Socialist Workers '74 Campaign Committee (Ohio)*, 459 U.S. 87, 97 (1982).

Further, unmasking may diminish the power of speaker's communication when their true identities are unpopular, as others may be more dismissive of the speakers' statements, and speakers may be chilled from continuing to speak publicly on that same topic. *See Doe v. Harris*, 772 F.3d 563, 581 (9th Cir. 2014) (anonymity "provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent.")

21

(internal quotations omitted); *Art of Living II*, 2011 WL 5444622 at *9 (recognizing that unveiling speakers' true identities "diminishes the free exchange of ideas guaranteed by the Constitution.").

Here, the anonymous defendants have expressed exactly such concerns regarding the need for anonymity. Defendant-Appellant Defcad User Freeman1337 stated:

> Prior to making my internet activities anonymous, I was direct messaged and threatened on Twitter and other platforms. Threats ranged from communication of my personal views and beliefs to my employer in the hopes of getting me fired to threats to murder me and my family with our own firearms as "payment for lives lost at Sandy Hook."

A288. Defendant-Appellant Odysee User xYeezySZN, Defcad User xYeezySZN, and Twitter User xYeezySZN stated:

> Prior to making my internet activities anonymous, my mother and I were "SWAT-ed" more than once. By "SWAT-ing" I am referring to the act of anonymously reporting to the police a false criminal emergency involving extreme danger to life and safety such that the police arrive at the scene at a heightened state of alert and heavily armed with the false expectation of a high probability of armed conflict with an alleged perpetrator at the scene. The result is a substantially increased probability of a person in the house being shot and killed by the police. This is a technique sometimes used to effectively commit murder against a disfavored person. My mother and I were SWAT-ed twice based on internet activity I engaged in prior to becoming anonymous. Fortunately, both times we were unharmed.

A291.

22

The chilling effect of unmasking an anonymous speaker is real and acute, and Defendants-Appellants have actual and direct experience in this regard.

### C. Before Courts Unmask Anonymous Speakers, Plaintiffs Must Meet a Substantial Evidentiary and Procedural Burden

Given the importance of anonymous speech to public discourse, and the potential impact of unmasking, no court should pierce anonymity without weighing the First Amendment interests at stake. Appellate courts in numerous states, as well as many federal courts, have developed a rigorous test for determining when plaintiffs are entitled to unmask anonymous speakers.

***Step one*** requires notice to the anonymous speakers, and withholding judgment on the unmasking request for a reasonable time sufficient to enable the anonymous defendants to retain counsel and present argument why their right to speak anonymously should be respected on the facts of the specific case. *Dendrite*, 775 A.2d at 141. Notwithstanding *Arista Records* and *Sony Music*, research has found *no court* that has allowed an anonymous speaker to be stripped of his First Amendment right to anonymity without having first been given notice.

Here, no notice was provided. Even though, in the Complaint, Plaintiff-Appellee acknowledged that that it had sufficient information to provide at least informal notice of its application to obtain expedited unmasking discovery, the district court did not require that it provide such notice, and it provided none.

23

**Step two** requires plaintiffs to meet some significant evidentiary burden to show the legitimacy of their case. *Highfields Capital Mgm't, L.P. v. Doe*, 385 F. Supp. 2d 969, 975-76 (N.D. Cal. 2005). Although courts have employed a variety of evidentiary standards at this step, Defendants-Appellants believe the summary judgment standard provides the proper protection for anonymous speakers. *Id.* at 975. The district court did not remotely require that Plaintiff-Appellee satisfy such a burden.

**Only if** plaintiffs provide notice and meet their evidentiary burden may the court proceed to **step three** which requires courts to balance the competing interests at stake. *See, e.g., Dendrite*, 775 A.2d at 760; *Independent Newspapers, Inc. v. Brodie*, 966 A.2d 432 (Md. Ct. App. 2009); *Highfields,* 385 F. Supp. 2d at 976; *Mobilisa, Inc. v. Doe,* 170 P.3d 712, 720 (Ariz. App. 2007). The plaintiffs' two interests are the strength of their case (the evidentiary showing) and the necessity of disclosing speakers' identities, including whether there are less invasive discovery tools available that would satisfy plaintiffs' needs. *See Art of Living II*, 2011 WL 5444622 at *10 (describing discovery alternatives short of an in-person deposition that would unmask Doe, such as depositions by telephone or via written questions).

On the other side of the scale, courts must consider the nature of the anonymous speech at issue in the case and the harm that would result from loss of anonymity. Regarding the nature of the speech at issue, "the specific circumstances

24

surrounding the speech serve to give context to the balancing exercise." *In re Anonymous Speakers*, 661 F.3d 1168, 1177 (9th Cir. 2011). Courts have found speakers have high First Amendment interests in anonymous political, religious, or literary speech. *See, e.g., Art of Living II*, 2011 WL 5444622 at *5-6 (finding critical commentary touched on matters of public concern). Courts must also consider whether the disclosure will chill the speech of others. *See Art of Living II*, 2011 WL 5444622 at *7 ("[W]here substantial First Amendment concerns are at stake, courts should determine whether a discovery request is likely to result in chilling protected activity"). These factors ensure that courts properly assess the "magnitude of the harms that would be caused to competing interests by a ruling in favor of plaintiff and by a ruling in favor of defendant." *Highfields*, 385 F. Supp. 2d at 976.

By incorrectly choosing the *Arista Records/SonyMusic* approach, the district court did none of the foregoing. It did not require notice. It required only the barest of prima facie showings. And it did no balancing against the critical First Amendment interests of Defendants-Appellants. This is because *Arista Records* and *Sony Music* did not implicate the kind of expressive free speech interests of a genuine anonymous online speaker scenario such as this one. *Arista Records* and *Sony Music* were about the naked theft-by-downloading of copyrighted music, where First Amendment protected interests are either non-existent or severely limited.

25

## II. The District Court Failed to Apply the First Amendment's Anonymous Speech Standard Prior to Issuing the Ex Parte Discovery Order

The district court erred by failing to subject Plaintiff-Appellee's discovery request to the robust standard outlined above. Adopting the correct test is especially critical here, given that Defendants-Appellants are using the marks to send a message about a highly political entity whose very mission is to loudly advocate for policies Defendants-Appellants strongly oppose – an activity lying at the heart of the First Amendment.

### A. Defendants Have Used the Marks in Question for Expressive Purposes Protected by The First Amendment.

The record below shows that Defendants-Appellants are using the marks in question for expressive purposes; specifically, to communicate their anger and contempt for the Plaintiff through the use of parody, satire, and mockery. A13 ¶¶ 137, 152, 166; A275-361. Regardless of whether this Court agrees with those views, such expression should trigger the requisite First Amendment scrutiny to ensure that Plaintiff-Appellee is not misusing trademark claims to unmask those who oppose its mission.

The crux of the dispute arises from allegations of activities that plainly constitute First Amendment protected speech. Plaintiff-Appellee alleges that "Everytown is the largest gun violence prevention organization in the United States." A20 ¶ 45. In describing its mission, Plaintiff-Appellee portrays itself as the *number*

26

*one* gun control advocacy group in the nation, holding rallies all over the country, selling t-shirts and placards, lobbying for and promoting gun control laws, and generally leading the way to restrict and ban various firearms and firearms related parts and accessories. A20-24, A27-32.

Among the missions Plaintiff-Appellee most heavily emphasizes is seeking to ban what it hyperbolically refers to as: "assault weapons," "high capacity magazines," and "ghost guns." *Id*. at ¶ 174.) These are the very things Plaintiff-Appellee most forcefully opposes. A50 ¶ 174, A279, A299-361. Notwithstanding the scary sounding and largely misleading names Plaintiff-Appellee assigns these objects, Plaintiff-Appellee cannot allege that they are anything other than broadly lawful to possess in most parts of the United States. In fact, it seems that what frustrates Plaintiff-Appellee the most is the broad legality of these items that it so dislikes.

Plaintiff-Appellee alleges that certain anonymous individuals and internet platforms have created and/or made available on-line 3D printable computer files that, when printed, produce objects that display Plaintiff-Appellee's trademarks. But here is the key First Amendment twist. The objects alleged to display Plaintiff-Appellee's trademarks when printed are the very things Plaintiff-Appellee *most* opposes. The Complaint alleges that the computer files will print as: "assault

27

weapons," "high capacity magazines," and "ghost guns" that display Plaintiff-Appellee's trademarks. A33-47 at ¶¶ 108-156.

In fact, as evidence of this allegation, the Complaint cites to numerous on-line photographs and tweets that mock and vilify Plaintiff-Appellee using the very objects Plaintiff-Appellee so despises and rails against publicly. *See, generally*, A13. Thus, the alleged use of Plaintiff-Appellee's trademarks cannot be for the purpose of causing confusion, and it beggars belief that anyone would see the 3D printed parts and be confused into believing that they originated from Plaintiff-Appellee. Rather, the purpose is plainly to criticize, parody, and mock Plaintiff-Appellee for its political activity.

And Plaintiff-Appellee cannot and does not allege a single instance of actual confusion or that any files were actually downloaded by anyone in New York.

"[T]he First Amendment confers a measure of protection for the unauthorized use of trademarks when that use is a part of the expression of a communicative message." *Yankee Pub. Inc. v. News America Pub. Inc*., 809 F. Supp. 267, 275 (S.D.N.Y. 1992). "In recognition of this … the Second Circuit has construed the Lanham Act narrowly when the unauthorized use of the trademark is for the purpose of a communicative message, rather than identification of product origin." *Id*. at 276. In *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989), the Court considered the potentially confusing use of the trademarks "Ginger and Fred" in the title of a

film not endorsed by Ginger Rogers. The Court held the public's interest in free speech outweighed its interest in being free from potential confusion. Under *Rogers*, the use of a trademark in an artistic work is permissible "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." *Id.* at 999. "The court in *Rogers* applied this test to the use of a trademark in a movie title, but courts have extended it to the content of expressive works as well." *Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.,* 868 F. Supp. 2d 172, 177 (S.D.N.Y. 2012) ("*Warner Bros.*"). An expressive work is any work that is "part of the expression of a communicative message." *Yankee Pub. Inc.,* 809 F. Supp. at 275-76. Courts have applied *Rogers* to political speech, for example, to protect the use of a political adversary's mark to express an opposing political message. See *Protectmarriage.com v. Courage Campaign*, 680 F. Supp. 2d 1225, 1229 (E.D. Cal. 2010) (upholding the use of a slightly altered version of an anti-gay marriage organization's logo on a pro-gay marriage website.); *see also Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 322, 327-29 (4th Cir. 2015) (rejecting trademark infringement claim under *Rogers* where defendant, a conservative activist group, used the mark "NAACP" in the title of a political article: "NAACP: National Association for the Abortion of Colored People").

Courts have also extended *Rogers* to expression inherent in simple objects. In *VIP Prod. LLC v. Jack Daniel's Properties, Inc*., 953 F.3d 1170, 1175 (9th Cir. 2020) (internal quotations omitted below), the Court found that incorporating Jack Daniel's famous marks into a dog chew toy was expressive and entitled to *Rogers* protection:

> Like the greeting cards in *Gordon*, the Bad Spaniels dog toy, although surely not the equivalent of the *Mona Lisa*, is an expressive work.…The toy communicates a humorous message, using word play to alter the serious phrase that appears on a Jack Daniel's bottle—'Old No. 7 Brand'—with a silly message—'The Old No. 2.' The effect is 'a simple' message conveyed by 'juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner.

Here, the complained of uses of Plaintiff-Appellee's marks are fully protected First Amendment political speech under *Rogers*. The files themselves qualify for First Amendment protection. *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 691 (W.D. Tex. 2015), *aff'd sub nom., Def. Distributed v. United States Dep't of State,* 838 F.3d 451, 2016 WL 5383110 (5th Cir. 2016) (finding that gun CAD files constituted speech under the First Amendment for purposes of preliminary injunction motion and finding support in *Universal City Studios, Inc. v. Corley,* 273 F.3d 429 (2d Cir.2001)). The politically expressive message being conveyed by the files and the parts produced from them is *inherent* in the juxtaposition of the logos with the files and the parts. When juxtaposed with Plaintiff-Appellee's marks, the files, and their listings and filenames, become political statements in which the presence of the Plaintiff-Appellee's marks is a

30

necessary part of the biting, parodic message. The message being communicated is one of opposition to Plaintiff-Appellee's anti-gun mission, criticism of Plaintiff-Appellee, celebration of Second Amendment rights, and defiance. A287-98. The intent to express these sorts of views is also made clear by the materials supporting Plaintiff-Appellee's papers, e.g., the taunt below sent to Plaintiff-Appellee's twitter account. A39-40 ¶136. The files are public political speech registering disagreement with Plaintiff-Appellee's political policy positions.



This sort of use easily clears *Rogers's* "low threshold", which requires only that the use of the mark bear some "minimal artistic relevance" to the underlying

work. *Rogers*, 875 F.2d at 999. Here, the message of opposition and defiance relies on the combination of Plaintiff-Appellee's mark with the gun parts that Plaintiff-Appellee seeks to criminalize. The marks have more than minimal relevance to the underlying work - they are the key to the message being sent.

The use of Plaintiff-Appellee's marks also clears *Rogers's* other hurdle. It does not *explicitly* mislead as to source. Mere use or reproduction of the plaintiff's mark, even unaltered and in its entirety, without more, is not *explicitly* misleading as to source. See *Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.,* 868 F. Supp. 2d 172, 179–80 (permitting complete reproduction of plaintiff's trademarks in a film); *Lamparello v. Falwell*, 420 F.3d 309, 316 (4th Cir. 2005) citing *Rogers*, 875 F.2d at 1000-01 ("Rather it has long been established that even when alleged infringers use *the very marks at issue* in titles, courts look to the underlying content to determine whether the titles create a likelihood of confusion as to source." (Emphasis added.))

Courts have suggested that the First Amendment right to use the marks of others for expressive purposes may be limited when the defendant has borrowed the plaintiff's mark in order to create confusion as to the source of goods. *Deere & Co. v. MTD Prod., Inc.*, 41 F.3d 39, 44–45 (2d Cir. 1994). But this is not occurring here. Defendants-Appellants are not using Plaintiff-Appellee's marks as their own source identifiers, i.e., as their own trademarks. In the printed parts, Plaintiff-Appellee's

marks, placed in the context of the parts themselves, are part of the expressive message. In the filenames and the listings, the use of Plaintiff-Appellee's marks is descriptive, rather than source identifying - it conveys to the viewer that the file is *for* printing gun parts that relate to Plaintiff-Appellee and its trademarks, but the listings make clear that the files are *from* sources other than Plaintiff-Appellee. In this way, Defendants-Appellants are engaged in a species of nominative fair use, where the Plaintiff-Appellee marks are being used, unambiguously, to *refer to* Plaintiff-Appellee and its mission, but not as source identifiers. See *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ.*, *LLC*, 823 F.3d 153, 167–68 (2d Cir. 2016) ("Nominative use involves using the mark at issue *as a mark* to specifically invoke the mark-holder's mark..."). This is clear in the listing provided in the Complaint, reproduced below. A42 ¶144.



In the listing above, it is clear that the source of the file is The Gatalog, because the listing literally says "The Gatalog Presents"[4]. Additionally, "Everytown" is in single quotation marks, indicating that the listing relates to a file that is *about* Everytown, but *from* the Gatalog. The same is true of the Defcad listings, one of which is reproduced below. A43 ¶147. Here again, the source of the file is FREEMAN1337, whose handle occurs both in the listing title, and in the

---

[4] The same source identifying language is used in The Gatalog listing shown at ¶140 of the Complaint. A40-41.

filename. The word EVERYTOWN is in quotes in the listing, indicating that the file is *about* Everytown, but it is *from* its uploader. Moreover, "Everytown" is included in a list of descriptive "tags," that is, information that describes other attributes of the file other than source, e.g., "AR15" and ".22lr".



This non-source identifying, expressive use of Plaintiff-Appellee's marks is entitled to protection under the First Amendment. As the court noted in *Tommy*

*Hilfiger Licensing, Inc. v. Nature Labs*, LLC, 221 F. Supp. 2d 410, 414 (S.D.N.Y. 2002):

> Cases finding that First Amendment interests prevail involve nontrademark uses of mark—that is, where the trademark is not being used to indicate the source or origin of consumer products, but rather is being used only to comment upon and, in the case of parody, to ridicule, the trademark owner.  In such cases, the parodist is not trading on the good will of the trademark owner to market its own goods; rather, the parodist's sole purpose for using the mark is the parody itself, and precisely for that reason, the risk of consumer confusion is at its lowest.

Thus, Defendants-Appellants' use of Plaintiff-Appellee's marks (and variations) in these files is clear parody.  Parody is a "simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the marks' owner." *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 881 F.2d 26, 34 (1st Cir. 1987); *see also Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 434 (S.D.N.Y. 2016) ("MOB"). While parody necessarily includes humor or entertainment, it will be subjective, and so even commentary viewed as criticism to some may still be parody. Here, the relevant audience (i.e. the sophisticated members of defcad.com) are likely to find the irreverent juxtaposition of an Everytown mark, or a variation thereof, with a small arms technical data file available on defcad.com very humorous and entertaining. A479 ¶16.  Contrastingly, as evidenced from the fact that this case is even being litigated in the first place, a vocal anti-gun organization like Plaintiff-Appellee will

likely find this satirical juxtaposition less humorous or even critical and will seek to stifle this free speech and suppress criticism and satire thrown in its direction. A481 ¶24.

The interests of Plaintiff-Appellee and its supporters and the interests of Defcad and its members are very publicly and vocally diametrically opposed. A476 ¶¶4, 13-15. The defcad.com platform, which is the world's largest repository for small arms technical data ("Data Files"), was created as a platform for free speech and in support of the Second Amendment. A476-77 ¶4. The ability to download the Data Files on defcad.com is limited to individuals who specifically request and are approved for a membership ("Members"). A476 at ¶3. These Members share beliefs similar to Defcad and have formed a community invested in protecting First Amendment free speech and the Second Amendment, including the rights surrounding small arms technical data files, which are the only type of data files available for Members on defcad.com. A476-77 ¶4.

In contrast to Defcad and its Members, Plaintiff-Appellee is the largest anti-gun group in the United States. A478 ¶13. Plaintiff-Appellee's widespread recognition and the strength of the Everytown marks makes it easier for the relevant Defcad Members to recognize that the use of these marks, and variations thereof, in the Data Files is a parody and a joke. McCarthy on Trademarks and Unfair Competition §31:153 (4th ed. 2001) ("The strength and recognizability of the mark

37

may make it easier for the audience to realize that the use is a parody and a joke on the qualities embodied in trademarked word or image”); *see also Tommy Hilfiger Licensing, Inc.*, 221 F. Supp. 2d at 416 (“It is precisely because of the mark’s fame and popularity that confusion is avoided, and it is this lack of confusion that a parodist depends upon to achieve the parody”); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 464 F. Supp. 2d 495, 499 (E.D. Va. 2006) (“*Haute Diggity Dog I*”) (“Strength of mark is usually a strong factor in determining customer confusion. However, in cases of parody, the opposite can be true.”).

Plaintiff-Appellee is very publicly involved in holding large anti-gun rallies and marches, and in funding heavily publicized anti-gun litigation. A478 ¶13. Plaintiff-Appellee has publicly opposed Defcad’s parent company, Defense Distributed, and has even attempted to intervene in several lawsuits in opposition to Defense Distributed. A478-79 at ¶15. Plaintiff-Appellee is not only vocally opposed to firearms, generally, but has also publicly voiced its opposition to the specific content available on defcad.com. A478 at ¶13. Plaintiff-Appellee’s knowledgeable and involved supporters are well aware of Plaintiff-Appellee’s positions, otherwise they would not be supporting the organization in the first place. A 478 at ¶14. It would be challenging to find two more diametrically opposed organizations, especially two organizations that are so well known and highly publicized. These types of directly opposed organizations are natural reciprocal parody targets.

38

The relevant audience here is Defcad's Members as the only individuals with access to the Data Files. A476-77 ¶¶3-4, 11-12. There is no chance that this sophisticated and knowledgeable audience is likely to be confused by the use of Plaintiff-Appellee's marks and variations thereof as part of these Data Files. Instead, these Members will immediately recognize the parody. Conveniently avoided by Plaintiff-Appellee in its Complaint is that these Data Files are only downloadable by Members. As such, the only relevant audience is the Defcad Members, a highly sophisticated group that is knowledgeable of the politics surrounding firearms and free speech and highly engaged in the debate over the First and Second Amendments. A477-78 ¶10. Defcad's passionate Members are very likely to be aware of Plaintiff-Appellee and its beliefs as unquestionably the most well-known organization opposed to Members' views. *Id*. Thus, the intended parody of juxtaposing Plaintiff-Appellee's marks and variations with these Data Files would most certainly be immediately recognized and very much appreciated by Defcad's Members. A479 ¶16. A message of parody or ridicule need not be explicit or textual and may, instead, be inherent in the juxtaposition of the mark with an unlikely product, or the placement of the mark in an unlikely context. *See MOB*, 156 F. Supp. 3d at 435 (involving a finding of parody where the Louis Vuitton marks were placed on a casual, canvas bag); *Tommy Hilfiger Licensing, Inc.*, 221 F. Supp. 2d at 416 (juxtaposing luxury brand trademarks with dog perfume found sufficient for

parody); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260-61 (4th Cir. 2007) *("Haute Diggity Dog II")* ("the juxtaposition of the similar and dissimilar – the irreverent representation and the idealized image of an LVM handbag – immediately conveys a joking and amusing parody.") Parody is clear from the juxtaposition of Plaintiff-Appellee's marks with a type of data file Plaintiff-Appellee works to criminalize.

There is no reasonable scenario in which confusion is likely, making the parody even stronger. As much as Plaintiff-Appellee may not like being the butt of a joke in the opposing Defcad community, the intended parody is certainly not lost on the relevant group of Defcad Members. The standard for parody is not whether the target of the parody gets its feelings hurt, but whether the relevant audience will appreciate the humorous, entertaining or critical message.

These Data Files not only incorporate Plaintiff-Appellee's marks, but also non-identical, humorous variations. While the juxtaposition of these marks, without variation, and the Data Files themselves are sufficient to clearly communicate the intended parody, an additional humorous element simply adds to the message. *See, e.g., Lamparello*, 420 F.3d at 316 n.4 (no confusion from use of entirety of plaintiff's mark in domain name for a comment and criticism website); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 807 (9th Cir. 2003) (no liability in photographer's use of plaintiff's unaltered BARBIE trademark and doll trade dress in photographs

40

featuring "nude Barbie in danger of being attacked by vintage household appliances.").

Upon downloading these Data Files, the downloader automatically receives three files, two of which incorporate humorous, non-identical variations of Plaintiff-Appellee's marks. A480 ¶21. These variations include, for example, "MILFS DEMAND ACTION FOR GUN SENSE IN AMERICA" (a humorous modification of Plaintiff-Appellee's purported MOMS DEMAND ACTION FOR GUN SENSE IN AMERICA mark) and "EVERYGUN SHOULD BE FULL AUTO" (a humorous modification of Plaintiff-Appellee's purported EVERYTOWN FOR GUN SAFETY mark). *Id*. "A parody must convey two simultaneous – and contradictory – messages: that it is the original, but also that it is not the original and is instead a parody." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc*., 886 F.2d 490, 494 (2d Cir. 1989) (emphasis in original). The latter message "must not only differentiate the alleged parody from the original, but must also communicate some articulable element of satire, ridicule, joking or amusement." *Haute Diggity Dog II*, 507 F.3d at 260; *see Cliffs Notes*, 886 F.2d at 496 (a work "is a parody if, taken as a whole, it pokes fun at its subject"). The download of this three-file group simply emphasizes the two necessary simultaneous messages of being the original, but not the original and instead a parody. As such, the recognition of the intended parody is simply unavoidable for the relevant audience.

41

**B.**     **There Is No Trademark Exception to First Amendment Protections for Anonymous Speakers.**

The district court gave only the barest nod to the important constitutional interests at stake, and applied a standard that is lower than the required First Amendment test described above, Section I.C., based on the assertion that "anonymity is not protected to the extent that it is used to mask the infringement of intellectual property rights, including trademark rights." A223. That cursory approach was mistaken, and the error stems in part from the court's reliance on a particular species of copyright case, rather than trademark cases. A222-23 (citing *Arista Records* and *Sony Music*). In the trademark context, numerous courts have correctly applied a more rigorous test. *See, e.g. Highfields,* 385 F. Supp. 2d at 976 (applying two-step test); *Faconnable USA Corp. v. John Does 1-10*, 2011 WL 2015515, at *2 (D. Colo. May 24, 2011), *vacated as moot*, 799 F. Supp. 2d 1202 (D. Colo. 2011); *Koch Indus. v. Does* 2011 WL 1775765, at *10 (D. Utah May 9, 2011) (adopting *Dendrite* test); *Salehoo Grp v. ABC*, 722 F.Supp.2d 1210, 1216-17 (W.D. Wa. 2010) (same). *See also Ron Paul 2012 Presidential Campaign Committee v. John Does 1-10*, Case No. 3:12-cv-00240-MEJ (Mar. 8, 2012). ]

For example, in *Koch Industries*, an activist group created a parody web site that included fake press release in which Koch Industries took responsibility for financing bogus research denying that fossil fuels contribute to climate change. 2011

WL 1775765 at *1-2. Although the press release was widely reported in the media as a hoax, Koch sued for trademark infringement, cybersquatting and other theories. *Id*. The trial court initially granted a motion for early discovery to identify the perpetrators, but it later granted the anonymous defendants' motion to quash on First Amendment grounds, after adopting and applying a version of the test described in Section I.C. *Id*. at 10. That careful approach is essential in trademark cases because, as courts around the country have recognized, trademark uses may implicate First Amendment interests in myriad ways. Thus, trademark rights must be carefully balanced against constitutional rights, to ensure that trademark rights are not used to impose monopolies on language and intrude on First Amendment values. *See*, *e.g.*, *Nike, Inc. v. Just Did It Enter.*, 6 F.3d 1225, 1226 (7th Cir. 1993) ("When businesses seek the national spotlight, part of the territory includes accepting a certain amount of ridicule. The First Amendment, which protects individuals from laws infringing free expression, allows such ridicule in the form of parody."); *CPC Int'l v. Skippy, Inc.*, 214 F.3d 456, 462 (4th Cir. 2000) ("[i]t is important that trademarks not be 'transformed from rights against unfair competition to rights to control language.'" (quoting Mark Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 YALE L.J. 1687, 1710-11 (1999)). This is true even in cases involving straightforward commercial trademark use between competitors; rather than barring *any* use of a competitor's mark, trademark law accommodates the First Amendment

43

by prohibiting only those uses that are likely to confuse consumers. *See VIP Prods. LLC*, 953 F.3d at 1174 (likelihood-of-confusion test "seeks to strike the appropriate balance between the First Amendment and trademark rights").

This Circuit has repeatedly noted that the public interest in consumer protection through trademark enforcement must be balanced against the public interest in free expression and that the analysis must be sensitive to the nature of the challenged expression. *Rogers*, 875 F.2d at 999 ([Lanham] Act should be construed to apply to artistic works "only where the public interest in avoiding consumer confusion outweighs the public interest in free expression"); *see also, e.g. Cliffs Notes, Inc.,* 886 F.2d at 495. Under *Rogers*, courts evaluating claims of trademark infringement involving expressive works recalibrate this balance for the weightier First Amendment interests involved by applying a different test than the standard likelihood-of-confusion analysis. *Id*. at 1001-02. Other Circuits have adopted a similar approach. *See e.g. Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1239 (9th Cir. 2013). Indeed, as the First Circuit noted in *L.L. Bean, Inc.*, 811 F.2d at 28 "trademarks have become a natural target of satirists who seek to comment on this integral part of the national culture." *Id*. (citing Harriette K. Dorsen, *Satiric Appropriation and the Law of Libel, Trademark and Copyright: Remedies Without Wrongs,* 65 B.U.L. Rev. 923, 939 (1986)).

For similar reasons, courts around the country have adopted nominative fair use tests, rather than the traditional likelihood of confusion analysis, where a defendant appears to be using a mark to refer to or comment on the mark owner itself. *New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302 (9th Cir. 1992); *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211 (3d Cir. 2005). The concerns that animate these doctrines also apply here, and explain why courts have normally applied a robust standard to request to unmask Does in trademark cases. The district court should have done the same.

### C. The *Arista Records/Sony Music* Standard Concerned Copyright Claims Involving a Specific and Distinct Speech Interest.

The *Arista Records/Sony Music* standard the district court relied on was developed in response to a very different sort of anonymous speech, and a different sort of intellectual property claim, than the speech against which Plaintiff-Appellee seeks relief. In *Sony Music*, a group of record companies sued 40 anonymous Internet users whose Internet Protocol addresses were associated with peer-to-peer music file sharing networks where musical recordings owned by the plaintiff companies had been made available for download. In analyzing the record label's discovery requests, the district court declined to apply a robust standard and instead identified five factors that should be weighed to decide whether their need for disclosure outweighed the First Amendment interests: "(1) a concrete showing of a prima facie

claim of actionable harm (2) specificity of the discovery request; (3) the absence of alternative means to obtain the subpoenaed information; (4) a central need for the subpoenaed information to advance the claim; and (5) the party's expectation of privacy." 326 F Supp. 2d at 564-65 (citations omitted).

In the seventeen years since *Sony Music*, Defendants-Appellants do not believe its rule has been applied outside of a narrow and specific context: when to allow copyright owners to identify anonymous Internet users accused of copyright infringement via peer to peer networks or BitTorrent swarms.[5] To Defendants-Appellants' knowledge, not a single court outside the Second Circuit has relied on *Sony Music* to decide whether to identify defendants alleged to have engaged in actionable speech for any reason other than copyright infringement. Indeed, hardly any courts have applied the standard in copyright cases not involving mass downloading. To the contrary, in every other jurisdiction where state appellate courts and federal trial courts have adopted First Amendment standards for deciding whether to approve unmasking orders in non-copyright cases, the courts have employed the test described above, Section I.C., because it is better suited to deciding whether to protect anonymous Internet users who engage in expressive

---

[5] *UMG Recordings, Inc. v. Does 1-4*, 2006 WL 1343597, at *2–3 (N.D. Cal. Mar. 6, 2006); *1O Group, Inc. v. Does 1-19*, 2010 WL 11583153, at *2 (N.D. Cal. Sept. 23, 2010); *Malibu Media, LLC v. John Doe Subscriber Assigned IP Address 174.51.234.104*, 2013 WL 3753436, at *4 (D. Colo. July 14, 2013).

speech. By requiring plaintiffs to meet three separate prongs, the First Amendment standard described above focuses the court's attention on the likelihood that plaintiff has a valid claim. And the third prong focuses the court's attention on whether there are ways to provide plaintiff with the information it seeks short of publicly unmasking the anonymous speaker and thus irrevocably harming their First Amendment rights.

The *Arista Records/Sony Music* standard, by contrast, makes the existence of a prima facie case only one factor, to be weighed against four other factors, so that, in theory, even a plaintiff that has failed to state a prima facie case could be held entitled to identify an anonymous speaker because the lack of merit to the claim could be outweighed by the other four factors. And because each of the final four factors in the *Arista Records/Sony Music* standard will typically favor disclosure, they provide a one-way ratchet in favor of disclosure; they do not aid courts in differentiating cases in which disclosure should be ordered from those in which it should be denied.

Further, in *Arista Records* and *Sony Music*, there was no meaningful dispute regarding the claim of downloading/copyright infringement. Here, the charge of trademark infringement is heavily disputed, both because of the First Amendment parody/satire defense and as to the actual elements of infringement, including

likelihood of confusion. Thus, the *Arista Records/Sony Music* framework is an *especially* poor choice for cases such as this.

This Circuit urgently needs a proper framework to apply in cases, like this one, that involve genuine First Amendment concerns, and the framework described in Section I.C. above, which every other court to address such issues has adopted in one form or another, should be the framework in this circuit.

## III. When Analyzed Under the Correct First Amendment Protective Approach, Granting Plaintiff-Appellee's Ex Parte Application to Order Unmasking Discovery was Erroneous and Unwarranted

### A. No Notice was Required by the District Court or Provided by the Plaintiff-Appellee.

As discussed above, step one in approaching an application to unmask an anonymous defendant requires notice. The Complaint, itself, demonstrates that Plaintiff-Appellee had sufficient information to provide at least informal notice to Defendants-Appellants, including a mailing address for Defcad, and email addresses and/or Twitter handles for other Defendants-Appellants. The district court did not consider this factor in its orders below.

Failure to provide notice is also a fundamental denial of Due Process under the Fourteenth Amendment. *Mullane v. Central Hanover Bank & Trust Company*, 70 S. Ct. 652, 657 (1950); s*ee also Strike 3 Holdings, LLC v. Doe,* 2019 WL 4752094, at *3-4 (E.D.N.Y. Sept. 30, 2019).

**B.** **Plaintiff-Appellee Did Not Meet Any Meaningful Evidentiary Standard in Its Application for Unmasking Discovery.**

Step two requires plaintiffs to meet some significant evidentiary burden, to show the legitimacy of their case, such as the summary judgment standard which Defendants-Appellants hereby endorse. *Highfields Capital Mgm't, L.P. v. Doe*, 385 F. Supp. 2d 969, 975-76 (N.D. Cal. 2005) (requiring plaintiff to meet the summary judgment standard before unmasking anonymous speakers) *Id*. at 975.

Not only can Plaintiff not meet this hurdle, but the district court did not even take this obligation seriously. Although by the time the court entered the Twitter Order and denied the Emergency Letter Motion Defendants-Appellants had mustered enormous opposition on the merits of Plaintiff-Appellee's trademark claims (ECF No. 56, A275-361) the district court relied on and rubberstamped the same cursory and conclusory findings it made solely on Plaintiff's *ex parte* moving papers back on November 9, 2021. SPA6.

And, in fact, Plaintiff-Appellee can meet neither the summary judgment standard nor any other meaningful evidentiary standard as to the merits of its claim. First, as set forth in detail above, Defendants-Appellants make a very strong record that their use of the marks at issue are First Amendment protected parody, satire, and mockery.

49

Further, even on the merits of its likelihood of confusion allegation, Plaintiff-Appellee cannot meet the required evidentiary burden to unmask these Defendants Appellants, as confusion is highly unlikely.

A trademark owner may not prevent all unauthorized uses of its marks. "The trademark owner's rights are violated only where the unauthorized use has a substantial capacity to mislead consumers (or other concerned actors in the marketplace) into a confusion as to the entity furnishing the goods or services. Mere unauthorized use does not by itself make out a cause of action; likelihood of confusion is also an essential element." *Yankee Pub. Inc.*, 809 F. Supp. at 272-73.

As explained above, confusion under the circumstances as alleged is unimaginable, not only because the goods and services of the parties are polar opposites, but because the complained of listings, files, and the printed parts themselves are a particular form of protected expression - unmistakable and non-confusing parodies, which express criticism of Plaintiff-Appellee and its mission, by jarringly, and always simultaneously, juxtaposing Plaintiff-Appellee's marks with the objects Plaintiff-Appellee opposes.

Courts in this circuit assess likelihood of confusion in reference to the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961), but in parody cases, the factors are analyzed differently. When correctly analyzed through the parody lens, it is clear that can be no confusion in this case.

50

**Strength of the Mark**.  Plaintiff-Appellee's marks are unquestionably strong, but this factor cuts *against* confusion here, because people familiar with the mark will immediately recognize that they are out of place on gun parts.  "The strength and recognizability of the mark may make it easier for the audience to realize that the use is a parody and a joke on the qualities embodied in trademarked word or image." McCarthy on Trademarks and Unfair Competition § 31:153 (4th ed.2001).  "That is, it is precisely because of the mark's fame and popularity that confusion is avoided, and it is this lack of confusion that a parodist depends upon to achieve the parody." *Tommy Hilfiger Licensing, Inc.*, 221 F. Supp. 2d at 416 and see *Haute Diggity Dog I*, 464 F. Supp. 2d at 499 ("Strength of mark is usually a strong factor in determining customer confusion. However, in cases of parody, the opposite can be true.")

**Similarity of the Marks**.  All parodies will be similar to the mark holder's mark.  In a parody case, the court must look at whether the overall context of the marks' presentation is similar between the parties.   "[A]n inquiry into the degree of similarity between two marks does not end with a comparison of the marks themselves.... the setting in which a designation is used affects its appearance and colors the impression conveyed by it." *Hormel Foods Corp*., 73 F.3d at 503 (2d Cir. 1996) (internal quotations omitted) and see *MOB*, 156 F.Supp.3d at 441 (finding contextual differences and therefore no confusion where Plaintiff's mark for luxury

handbags was placed on a casual canvas tote). Here, as the excerpted ads above show, Defendants-Appellants always present the marks in conjunction with photographs or textual descriptions of guns and gun parts, as well as with the uploader's own trademarks. The listings are presented in subdued colors, with some listings, like the Defcad listings, heavily favoring black. Yet, looking at the examples in the Complaint (see, ¶56), Plaintiff-Appellee uses a bright, red-white-and-blue color scheme, and appears to avoid using its marks in conjunction with photographs of firearms and parts. The strikingly different contexts in which the marks are presented makes clear that the files are originating from some entity other than Plaintiff-Appellee.

Where, as here, the contextual presentation of the marks is sufficiently different, and the message being conveyed by the parodist is clear, there can be no confusion even if plaintiff's marks are used without alteration. *See, e.g.*, *Lamparello*, 420 F.3d 316 n.4 (finding no confusion from the use of the entirety of plaintiff's mark in a domain name for a comment and criticism website); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 807 (9th Cir. 2003) (citing *Rogers* to find no liability in an photographer's use of plaintiff's unaltered BARBIE trademark and doll trade dress in allegedly tarnishing photographs featuring "a nude Barbie in danger of being attacked by vintage household appliances.").

**Proximity of the Goods.** This factor could not tip more heavily in Defendants-Appellants' favor. This factor looks to market overlap between the parties, including shared marketing channels and shared customers. See *Hormel Foods Corp.*, 73 F.2d at 504. The services Plaintiff-Appellee provides under its marks include lobbying for the criminalization of so-called "assault weapons", so-called "high capacity" magazines, and 3D printed guns and parts. A194 ¶52. Defendants-Appellants are using the marks to describe files to print precisely the sorts of goods that Plaintiff-Appellee wants to criminalize. Not only is there not competitive overlap[6], the services provided by the parties are diametrically opposed. They could not be more diametrically opposed. The services in this case are clearly less similar than in many of the successful trademark parody cases considered by courts in this Circuit. *See e.g.*, *MOB*, 156 F. Supp. 3d at 442 (no competitive proximity between canvas tote bag and high end handbag); *Tommy Hilfiger Licensing, Inc.*, 221 F. Supp. 2d at 418-19 (no competitive proximity between pet cologne and human cologne).

Moreover, the same stark differences between the goods and services of the parties makes post-sale confusion impossible. Even if someone sees a printed gun part bearing the Everytown marks at, for example, a shooting range, that person,

---

[6] *See Woodstock Ventures LC v. Woodstock Roots*, LLC, 387 F. Supp. 3d 306, 318 (2019) (finding no competitive overlap, and declining to issue preliminary injunction).

who is likely also familiar with Plaintiff-Appellee and its anti-gun mission, will not be confused. Courts in this circuit have rejected post-sale confusion theories based on much more similar goods. See *MOB*, 156 F.Supp.3d at 443-44 (noting that "[t]he Second Circuit, however, has generally found post-sale confusion actionable only in the context of knockoffs…" and "no reasonable observer is likely to infer from the cartoon-like bag-within-the-bag design and the juxtaposition of MOB's basic, canvas tote with the exclusive, luxury status of Louis Vuitton that Louis Vuitton sponsors or otherwise approves of MOB's tote bags.")

Additionally, the respective "customers" for the parties could not be more different. Defendant's files are sought and used by people interested in 3D printing gun parts - people who have a moral disagreement with Plaintiff-Appellee and its message. Plaintiff-Appellee's donors, members and allies are people who support the criminalization of 3D printing gun parts, and who presumably have a moral disagreement with Defendants. There is no overlap between these groups.

**Bridging the Gap**. This factor favors Defendants-Appellants. As is clear from Plaintiff-Appellee's website, it is a sworn enemy of 3-D printed "ghost guns," "assault weapons," and "high capacity magazines." A299-361. The notion that Plaintiff-Appellee might, someday, reverse course on this issue is ridiculous.

**Actual Confusion.** This factor favors Defendants. The absence of evidence of actual confusion despite a long period of Defendants-Appellants' use of the mark

is probative of no likelihood of confusion. See *Nikon, Inc. v. Ikon Corp*., 803 F. Supp. 910, 921 (S.D.N.Y. 1992). Here, the complained of files have been in circulation since June 2021 at the latest. *See* Defcad screenshot *supra*. Plaintiff-Appellee alleges that the file listings have been viewed on the Internet thousands of times and files themselves have been downloaded hundred times. *See, e.g*., Galloway Dec., A181-89 ¶¶ 22, 28, 37, 39 and 50. Plaintiff-Appellee alleges that Twitter user XYeezySZN, and other non-parties, have been publicly taunting it on Twitter with photographs of printed gun parts bearing the marks. A182-82, A190-91 ¶¶30, 51. Twitter user XYeezySZN has almost 4,000 Twitter followers.A183-84 ¶32. The fact that Plaintiff-Appellee ***cannot find a single person***, for example, a single person among its 250k Twitter followers, who was actually confused about the very public appearance of these designs is strong evidence that confusion is unlikely.

**Defendants-Appellants' Good Faith.** This factor favors Defendants-Appellants. The relevant bad faith in a trademark infringement action, particularly one involving parody, is not the intent merely to *use* the plaintiff's mark, but the intent to *confuse* the public as to source. Here, there is no evidence that Defendants-Appellants intend to trick the public into believing that Plaintiff-Appellee now makes gun printing files. Rather, the intent is to communicate a message of disapproval of Plaintiff-Appellee's mission through mockery. A287-98. Such intent does not show bad faith. *See Tommy Hilfiger Licensing, Inc*., 221 F. Supp. 2d at

55

419-20 citing *Jordache Enters., Inc. v. Hogg Wyld, Ltd*., 828 F.2d 1482, 1486 (10th Cir.1987) (holding that LARDASHE mark on jeans for oversized women was an intentional parody of JORDACHE, but finding no intent to confuse).

**The Quality of Defendants' Goods.** This factor is neutral. Plaintiff-Appellee has offered no evidence that the files, or the parts printed from them, are low quality. The Defcad listing reproduced above indicates positive reviews.

**Customer Sophistication.** This factor favors Defendants-Appellants. Contrary to Plaintiffs assertions, Defendants "customers" are not the general public - rather they are 3D printed gun enthusiasts, who presumably would have access to 3D printers. Not only, then, are barriers to entry to this insular community high, its members can be presumed to be very familiar with Plaintiff-Appellee and its mission, since that mission is, quite literally, to turn 3D printed gun enthusiasts into federal criminals. The only third party identified by Plaintiff-Appellee as actually having put its marks on a gun, the twitter user "Lord Dianexis PhD", clearly knows exactly who Plaintiff-Appellee is and is taunting it. A33-34 ¶108. The idea that such people would carelessly assume a gun printing file originates from Plaintiff-Appellee is unimaginable.

In any event, because Defendants-Appellants are engaged in protected speech, *Plaintiff must tolerate some level of potential confusion*. See *Yankee Pub. Inc.,* 809 F. Supp. at 275, 281; *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd*., 996 F.2d

56

1366, 1379 (2d Cir. 1993) ("However, the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers"); AM Gen. LLC v. Activision Blizzard, Inc.,* 450 F. Supp. 3d 467, 479 (S.D.N.Y. 2020) ("an artistically relevant use will outweigh a moderate risk of confusion where the contested user offers a 'persuasive explanation' that the use was an 'integral element' of an artistic expression rather than a willful attempt to garnish the trademark owner's goodwill for profit."); *Cliffs Notes, Inc.*, 886 F.2d at 497 (finding book parody "raises only a slight risk of consumer confusion that is outweighed by the public interest in free expression, especially in a form of expression that must to some extent resemble the original.").

Plaintiff-Appellee's state infringement and unfair competition also fail. Such claims require likelihood of confusion and are subject to the same First Amendment concerns as its Lanham Act claims, and so fail for the same reasons. *Yankee Publ'g Inc*., 809 F. Supp. at 282 ("[T]he same First Amendment considerations that limit a cause of action under the Lanham Act apply also to a cause of action under New York law."); *AM Gen.,* 450 F. Supp. 3d at 477-87 (applying *Rogers* to New York infringement and unfair competition claims); *Katz v. Modiri*, 283 F. Supp. 2d 883, 899 (S.D.N.Y. 2003) (denying motion for preliminary injunction as to its state and federal unfair competition claims because plaintiff was unlikely to prevail on the merits of its claim of infringement).

Additionally, in addition to likelihood of confusion, a "plaintiff claiming unfair competition under New York law must also show that the defendant acted in bad faith." *WIZKIDS/NECA*, *LLC v. TIII Ventures*, *LLC*, No. 17-CV-2400 (RA), 2019 WL 1454666, at *14 (S.D.N.Y. Mar. 31, 2019) (citing *Empresa Cubana del Tabaco v. Culbro Corp*., 399 F.3d 462, 485 (2d Cir. 2005) (dismissing unfair competition claims where there was no evidence the alleged infringer engaged in bad faith). Here, there is no credible evidence of bad faith. For the reasons set forth above, the marks are being used as part of a non-confusing and expressive message. There is no bad faith intent to confuse.

Similarly, because Defendants-Appellants are engaged in free speech protected under the First Amendment, there can be no liability for state dilution under NYGBL §360-L. *Warner Bros*., 868 F. Supp. 2d at 184 ("Louis Vuitton's pendant state law claim under New York's anti-dilution statute and its common law claim of unfair competition are likewise dismissed because they are based on the same permissible conduct as its Lanham Act claim."); *L.L. Bean, Inc.*, 811 F.2d at 32 ( "It offends the Constitution ... to invoke the [Maine] anti-dilution statute as a basis for enjoining the noncommercial use of a trademark by a defendant engaged in a protected form of expression.").

The *L.L. Bean* case from the First Circuit is instructive. There, a pornographic magazine sold by Defendant included a parody article that "displayed a facsimile

of Bean's trademark and featured pictures of nude models in sexually explicit positions using 'products' that were described in a crudely humorous fashion." *L.L. Bean*, 811 F.2d at 27. Despite the fact that the article was present in a magazine, which people paid for, the Court found that it was protected, non-commercial speech that did not actionably tarnish plaintiff's trademark under Maine's dilution statute. Central to the Court's analysis was that L.L. Bean's marks were not being used to market a competing, but incompatible product, but rather "the instant defendant used plaintiff's mark solely for noncommercial purposes. Appellant's parody constitutes an editorial or artistic, rather than a commercial, use of plaintiff's mark." *Id*. at 33. The Second Circuit adopted a similar analysis in *Hormel* where it permitted the parodic use (SPA'AM) of the mark SPAM on an ugly Muppet character. Central to the court's holding was the fact that defendant was not using the mark to market competitive goods. *Hormel*, 73 F.3d at 507-08. Here, as in these cases, Plaintiff-Appellee's marks are not being used for any commercial purpose such as the marketing or advertising of any goods, much less competitive goods. To the extent there are products here, the marks *are* an essential part of the products, or in the words of the *Hormel* court, "inhere" in the products. *Id*. It is the melding of the marks and the gun parts that forms the parodic, political, non-commercial speech, which is non-dilutive as a matter of law.

Plaintiff-Appellee's position, ultimately, is that NYGBL §360-l prevents any party from using its marks to criticize it and its political policy positions, because such criticism tends to tarnish the marks. But the law of dilution does not stretch so far. The federal dilution statute provides a fair use defense for precisely the sort of critical, parodic use at issue here. 15 U.S.C. §1125(c)(3)(A)(ii) permits the use of another's mark for "identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.". The Court should apply this exception here. *Tiffany (NJ) Inc. v. eBay, Inc.,* 576 F. Supp. 2d 463, 523 (S.D.N.Y.2008) (interpreting §360-L in light of the Lanham Act); *Allied Interstate LLC v. Kimmel & Silverman P.C.*, No. 12 CIV. 4204 LTS SN, 2013 WL 4245987, at *5 (S.D.N.Y. Aug. 12, 2013 (finding no tarnishment under §360-L when plaintiff's mark was used without alteration on a web blog devoted to criticism); *MOB*, 156 F. Supp. 3d at 433-40 (finding no dilution under New York law while applying the Lanham Act's dilution fair use defense to a trademark parody).

Finally, Defendants-Appellants have interposed significant objections to personal jurisdiction and venue which stand starkly in the way of Plaintiff-Appellee making the strong showing it must in order to even warrant a court moving on to step three of the analysis. ECF 56 at 3, A275-298.

Plaintiff-Appellee plainly cannot meet the step two hurdle of making the required strong evidentiary showing on the merits of its trademark claims, but the

district court did not even take this obligation seriously. Although by the time the district court entered the Twitter Order and denied the Emergency Letter Motion Defendants had mustered enormous opposition on the merits of Plaintiff trademark claims (ECF No. 56, A275-361, A476-83), the district court relied on and rubberstamped the same cursory and largely conclusory findings it made solely on Plaintiff's *ex parte* moving papers way back on November 9, 2021. SPA6).

### C. The District Court Performed no Balancing of Defendants' First Amendment Interests, Nor Would Such Balancing Favor Unmasking.

Step three, assuming the Plaintiff-Appellee had provided notice and met its evidentiary burden, required the district court to balance the competing interests at stake. *See, e.g., Dendrite*, 775 A.2d at 760; *Highfields*, 385 F. Supp. 2d at 976.

Here, Plaintiff-Appellee simply cannot show any need for unmasking to overcome the very strong First Amendment interest of the anonymous Defendants-Appellants. The district court gave no consideration to the fact that, unlike other anonymous speech cases, the anonymous defendants here are now joined in the case, are represented by counsel, and subject to their objections to jurisdiction and venue are before the court. Plaintiff-Appellee has *never* explained why they still need to know the identities of these defendants in order to advance their claims, nor has the district court ever made any specific findings on this

issue. The anonymous parties have appeared through counsel (subject to the resolution of objections of personal jurisdiction and venue) and have agreed to be bound by orders of the court. A287-96. Why, specifically, does the Plaintiff-Appellee still need to know their identities?

And, in fact, it may *never* be necessary to unmask them for Plaintiff-Appellee to advance its claims. *Signature Management Team LLC v. Doe*, 876 F.3d 831 (6th Cir. 2017) (unmasking might be entirely unnecessary because the defendant, while remaining anonymous, fully complied with the judgment of the district court).

Plaintiff-Appellee utterly failed to satisfy the very strong showing required to overcome the essential First Amendment rights of Defendants-Appellants, and the Ex Parte Discovery Order and the Twitter Order should be vacated.

## IV. The Ex Parte Discovery Order Employs an Utterly *Ad Hoc* Third Party Procedure Not Tethered To Fed. R. Civ. P. 45

There is no authority for the district court to have allowed an *ad hoc* process for third party discovery untethered from the Federal Rules of Civil Procedure. Third party discovery must take place pursuant to a Rule 45 subpoena. Rule 45 contains substantial procedural protections for both the third party target of the subpoena and the subject of the subpoena, including interposing objections, motions to quash, etc. The Ex Parte Discovery Order contains none of these protections. It merely purports

to bind third parties not before the Court such as Twitter and Odyssee. There is no law or court procedure that authorizes such an order, nor is there law or rule that authorizes a court to issue an order to an unnamed category of targets over which it has no jurisdiction, such as "third party service providers" as this Ex Parte Discovery Order purports to do. Such an order is literally limitless and therefore should be vacated.

## CONCLUSION

For all the foregoing reasons, Defendant-Appellants respectfully request that this Court vacate the Ex Parte Discovery Order (SPA1) and the Twitter Order (SPA6) and hold that Plaintiff-Appellee has failed to make the necessary showing to obtain discovery that would identify and unmask the anonymous Defendants-Appellants.

> HARTMAN & WINNICKI, P.C.
> Attorneys for Defendants-Appellants
>
> By: s/DANIEL L. SCHMUTTER
> DANIEL L. SCHMUTTER

DATED: April 5, 2022

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 13,994 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
    April 5, 2022

**SPECIAL APPENDIX**

**i**

## SPECIAL APPENDIX
## TABLE OF CONTENTS

**Page**

Plaintiff's Order to Show Cause for Preliminary
    Injunction, Expedited Discovery, and Alternative
    Service, So-Ordered November 5, 2021 ................ SPA-1

Order of the Honorable Paul G. Gardephe,
    Approving Stipulation between Plaintiff
    Everytown for Gun Safety Action Fund, Inc.
    and Third Party Twitter, Inc., dated
    December 17, 2021 .................................................. SPA-6

Constitutional Provisions, U.S. Const. Amend. I and
    U.S. Const. Amend. XIV, § 1 ................................ SPA-9

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EVERYTOWN FOR GUN SAFETY
ACTION FUND, INC,

                            Plaintiff,

            - against -

DEFCAD, INC.; ODYSEE USER
XYEEZYSZN; DEFCAD USER
XYEEZYSZN; ODYSEE USER
THEGATALOG-
PRINTABLEMAGAZINES; THE
GATALOG; DEFCAD USER
FREEMAN1337; TWITTER USER
XYEEZYSZN; and PHILLIP ROYSTER,

                            Defendants.

---

**<u>ORDER TO SHOW CAUSE</u>**

21 Civ. 8704 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On October 22, 2021, Plaintiff Everytown For Gun Safety Action Fund, Inc.
("Everytown") filed a complaint alleging trademark infringement, false designation of origin,
unfair competition, and trademark dilution against various designers and distributors of
downloadable files for the 3-D printing of firearm parts and accessories. (Dkt. No. 1)
Everytown asserts that it owns numerous trademarks that advance its pro-gun safety mission
("Everytown Marks"). According to the Complaint, Defendants distributed downloadable files
for the manufacture of 3-D printed gun parts and accessories, some of which unlawfully bear the
Everytown Marks ("Infringing Products"). On the same day it filed the Complaint, Everytown
moved by order to show cause for a preliminary injunction; for expedited discovery; and for
permission to utilize alternative service (the "Application"). (Dkt. No. 13)

Having reviewed the Complaint and Plaintiff's Application, it is hereby ordered

SPA-2

that Defendants Defcad, Inc., Odysee User XYEEZYSZN, Defcad User XYEEZYSZN, Odysee User THEGATALOG-PRINTABLEMAGAZINES, The Gatalog, Defcad User FREEMAN1337, Twitter User XYEEZYSZN, and Phillip Royster show cause before this Court on **December 2, 2021** at **11:30 a.m.**, why a preliminary injunction should not be issued enjoining and restraining the Defendants and their officers, agents, servants, employees, and attorneys, and all others in active concert or participation with them ("Restrained Parties"), from directly or indirectly:

1. manufacturing, making, buying, purchasing, importing, shipping, delivering, advertising, marketing, promoting, offering to sell, selling, or otherwise distributing or disposing of, in any manner, the Infringing Products or any other files, instructions for manufacture or infringing products, including but not limited to, or firearms, firearm parts and/or accessories:

    a. bearing the Everytown Marks or any similar mark likely to cause confusion with the Everytown Marks, any of which shall be removed from Defendants' accounts; or b. bearing the false representation that they are distributed by Everytown or otherwise under Everytown's control or supervision, when they are not, any of which shall be removed from Defendants' accounts;

2. manufacturing, making, buying, purchasing, importing, shipping, delivering, advertising, marketing, promoting, offering to sell, selling, or otherwise distributing or disposing of, in any manner, any products bearing the Everytown Marks or similar marks likely to cause confusion with the Everytown Marks, that are not actually produced, imported, or distributed under Everytown's control or supervision, or approved for distribution in the United States by Everytown in connection with the Everytown Marks;

3. committing acts calculated to cause purchasers to believe that the Infringing Products originate with Everytown when they do not;

4. diluting or tarnishing the Everytown Marks, or the reputation, value or goodwill associated therewith;

5. attempting, causing, or assisting in any of the above-described acts, including but not limited to enabling others in the above-described acts, or passing on information to others to allow them to do so; and

6. forming or causing to be formed any corporation or other entity that engages in the above-described acts. The Restrained Parties shall further be required to remove and/or disable any existing webpages offering or otherwise distributing the Infringing Products to the public, and shall be prohibited from creating any additional listings or

2

SPA-3

Webpages that offer, otherwise distribute, or promote the Infringing Products, and/or any other products that are likely to cause confusion with the Everytown Marks.

Opposition papers, if any, are to be filed by Defendants with this Court and served by personal service, notice of electronic filing, facsimile, or email upon Everytown's legal counsel, Marcella Ballard, Meaghan Kent, and Maria Sinatra, of Venable LLP, at their offices at 1270 Avenue of the Americas, 24th Floor, New York, NY 10020, on or before **November 11, 2021**, and reply papers shall be filed and served in the same manner on or before **November 26, 2021**.

It is further ordered that any third-party service provider providing services to Defendants, with the exception of Defendant Defcad, Inc., shall within seven days after being served with or receiving actual notice of this Order, provide to Everytown, via its legal counsel, expedited discovery, including copies of all documents and records in such third party's possession or control relating to:

1. the true identities and addresses of Defendants, and the locations and identities of the relevant Defendants' operations, including without limitation identifying information associated with their seller accounts, online account, or bank, merchant, or payment processing account(s), and related financial accounts(s), or payment means by which Defendants have transacted the business complained of herein;

2. any and all known internet websites or online accounts owned or operated by Defendants, including but not limited to Twitter.com, Defcad.com, and Odysee.com accounts;

3. any and all documents related to the distribution of the Infringing Products; and

4. any and all known registered entities or businesses owned, registered, or used by Defendants related to Defendants' conduct at issue in this action.

It is further ordered that Defendant Defcad, Inc., and third parties Odysee, Inc. and Twitter, Inc. shall, within seven days after being served with or receiving actual notice of this Order, provide to Everytown, via its legal counsel, expedited discovery, including copies of

3

all documents and records in such party's possession or control relating to:

1. the true identities and addresses of Defendants, and the locations and identities of the relevant Defendants' operations, including without limitation identifying information associated with their seller accounts, online account, or bank, merchant, or payment processing account(s), and related financial accounts(s), or payment means by which the individual Defendants have transacted the business complained of herein;

2. any correspondence with the Defendants' seller accounts pertaining to Everytown's notice of infringement, including but not limited to, identifying the means and/or manner in which communications were made to the Defendants;

3. the number of times Defendants' Infringing Products were accessed or otherwise downloaded by the public; and

4. any complaints received related to Defendants' Infringing Products.

It is further ordered that, good cause having been shown, Everytown may serve upon all Defendants and upon any third-party service providers the documents initiating this matter, including the Complaint, Summons(es), Application for Order to Show Cause and supporting papers, corporate disclosure statements, and the Orders herein, by email or other electronic means, and/or by overnight courier, to the degree necessary to ensure and effectuate service. Everytown has stated that it has not been able to ascertain any of the Defendants' physical addresses, with the exception of Defendant Defcad, Inc. Therefore, Everytown is directed to serve Defendant Defcad, Inc. via the email address support@defcad.com, with a copy of the same via overnight delivery to 1 Riverfront Place Suite 415 North Little Rock, AR 72214. Everytown is directed to serve the other Defendants via the email addresses currently in Everytown's possession as detailed in the chart attached hereto as Exhibit 1. Upon receipt of third-party discovery identifying any physical addresses or additional emails pertaining to the Defendants, Everytown is ordered to serve those Defendants using expedited discovery information obtained in accordance with this Order.

It is further ORDERED that, good cause having been shown, service of the

4

SPA-5

foregoing papers shall be made on Defendants within (5) five business days of November 5, 2021.  Service may be made upon any third-party service provider at an earlier date to ensure full execution of the terms of this Order. To the extent that Everytown is unable to obtain third-party compliance with this order to effectuate service, Everytown will file a letter with the Court describing its efforts to effectuate service, why it has not been able to effectuate service, and any third parties that have not complied with the Court's Order to provide expedited discovery in advance of the service deadline described herein.

Dated: New York, New York
       November 5, 2021

SO ORDERED:

Paul G. Gardephe, U.S.D.J.

**SPA-6**

Case 1:21-cv-08704-PGG   Document 69   Filed 12/15/21   Page 7 of 13

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EVERYTOWN FOR GUN SAFETY ACTION FUND, INC., | Civil Action No: 1:21-cv-8704 |
| Plaintiff, | |
| v. | **ORDER APPROVING STIPULATION BETWEEN PLAINTIFF EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND THIRD-PARTY TWITTER, INC.** |
| DEFCAD, INC.; ODYSEE USER XYEEZYSZN; DEFCAD USER XYEEZYSZN; ODYSEE USER THEGATALOG-PRINTABLEMAGAZINES; THE GATALOG; DEFCAD USER FREEMAN1337; TWITTER USER XYEEZYSZN; PHILLIP ROYSTER. | |
| Defendants. | |

Whereas the Court finds that Everytown's Application[1], Complaint, and request for

expedited discovery satisfies the factors articulated by the Second Circuit in *Arista Records, LLC*

*v. Doe 3*, 604 F.3d 110 (2d Cir. 2010),[2] pertaining to "preserving an objecting party's

anonymity," namely that:

(1) Everytown has made a *prima facie* showing of actionable harm (Nov. 9 Order, ECF

38, at *4 ("Everytown has alleged a *prima facie* case of trademark infringement . . . ");

---

[1] Everytown's Application included a memorandum of law, sworn declarations, and accompanying exhibits.  [ECF Nos. 13-18].

[2] The factors articulated in *Arista Records* include: "(1) [the] concrete[ness of the plaintiff's] showing of a prima facie claim of actionable harm, ... (2) [the] specificity of the discovery request, ... (3) the absence of alternative means to obtain the subpoenaed information, ... (4) [the] need for the subpoenaed information to advance the claim, ... and (5) the [objecting] party's expectation of privacy."  *See* 604 F.3d at 119 (citing *Sony Music Entm't, Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 564–65 (S.D.N.Y. 2004)).

(2) the information ordered to be disclosed below is narrowly tailored "regarding each Defendant's true identity, including name[] and email address[]." (*Id.* at *2);

(3) Everytown has not been able to obtain or ascertain this information from another source (Nov. 5 Order, ECF 30, at *4 (noting "Everytown has stated that it has not been able to ascertain any of the Defendants' physical addresses, with the exception of Defendant Defcad, Inc.");

(4) Everytown cannot advance its claims without the information ordered to be produced below (Nov. 9 Order, ECF 38, at *4 ("Plaintiff cannot effectively litigate its claims without obtaining the identities of the infringing parties."); and

(5) the defendants' expectation of privacy, while a factor, is outweighed in this case by Everytown's need for the information ordered to be produced below.  Indeed, defendants "may not use the First Amendment to encroach upon the intellectual property rights of others." (*Id.* *3-4 (citing *Bloomberg, L.P. v. John Does 1-4*, 2013 WL 4780036, at *4 (S.D.N.Y. June 26, 2013))).

The Court has again considered the five-factor unmasking standard articulated in *Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010), finds it has been met in this case, and accordingly orders that:

1.      Within seven (7) days of the date the Court enters this Order, Twitter will produce certain basic subscriber information of the anonymous defendants contained in Twitter's records, specifically: any names, telephone numbers, email addresses, and dates of birth provided by the registrant / user(s) of the Account(s);

2.      Twitter is not required to produce the remainder of the materials identified in Court's November 5 expedited discovery order [ECF 30];

SPA-8

3.      To the extent Everytown For Gun Safety Action Fund, Inc. seeks further discovery from Twitter in this case, it must seek such discovery by Federal Rule of Civil Procedure 45 subpoena; and

4.      Twitter's Motion to Intervene [ECF 43] and its Motion to Modify [ECF 44] are denied as moot.

**SO ORDERED.**

Dated: December  17 , 2021

_____
Hon. Paul G. Gardephe
United States District Judge

SPA-9

# CONSTITUTIONAL PROVISIONS

***U.S. Const. Amend. I***

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

***U.S. Const. Amend. XIV***, **§ 1**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.